Good afternoon, Council. We have only one case this afternoon, and that will be Logic Technology Development v. United States Food and Drug Administration, and we will start with the petitioner. Thank you, Your Honor. I'm Mishat Seytlin for Logic. I'd like to reserve three minutes for rebuttal if I could. In his PMTAs, Logic showed via randomized controlled trials that our menthol-flavored ends help smokers quit smoking or substantially reduce smoking, including the 37% of cigarettes that are out there that are menthol-flavored. We also showed in FDA's own words that there was a low prevalence of youth use of our ends. In fact, the largest share of users of our ends are over 61 years old. Now, the Office of Science went back and forth with us for years, studied this data for years, looked at it, and concluded that, of course, our products were appropriate for approval and, in fact, would have approved us. But then new leadership took over at FDA and adopted a then-secret policy that gerrymandered the analysis to ensure that all menthol-flavored ends, PMTAs, would be denied. Mr. Seytlin, I understand you perceive a sort of moving target, but isn't that in part because the data itself was evolving and the data as to the migration of youth to, you know, including the menthol e-cigarettes for 2022 was so different than it was back in 2018, 2019? Well, so in 2020, FDA, in its deficiency letter, specifically told us correctly that while all e-cigarettes are flavored, there's two flavors that mimic flavors in combustible cigarettes, tobacco and menthol, and those have less appeal to youth than candy-flavored, fruit-flavored, etc. FDA points to no evidence that has changed since 2020 when they sent us that deficiency letter taking that correct position that shows anything different. Doesn't the National Youth Survey point that out, and isn't that included in the TPO? No, this is what the National Youth, the 2022 Youth Survey says. It says that fruity flavors are used by 69% of youth end-users. Candy flavors are used by 38%. Menthol is used by 26%. If anything, that entirely defeats the core premise of their then-secret policy that menthol equals fruit equals candy. It entirely refutes it. The only other data that they point to was a PATH study from 2020 at the same time that they correctly told us that menthol and tobacco were in one category and the fruit and candy are in the other. That study lumps together menthol and mint and doesn't give any sort of indication that menthol appeals more than tobacco. Once that's disaggregated in 2021 and 2022, it appears that menthol and mint are very close, and neither of them is very far from the sweet flavors. Well, I mean, they are very close, but with sweet flavors, that's 38%. As a former smoker, menthol, I can't imagine mint, but that's okay. Fair enough, Your Honor. So on the 2022 survey, mint and menthol are close. So the big difference between menthol and mint, of course, is there are menthol cigarettes out there. There are no mint cigarettes. But the FDA didn't just equate us with mint. They put the same burden on us as if we were selling fruit and candy. And that's what's in their then-secret policy in the memos. Were there any studies done showing the smoker's actual use of menthol-flavored in comparison to the actual use of tobacco-flavored ends? With regard to our products, we did do two randomized control studies. What those studies show is that our menthol-flavored ends help smokers switch and help smokers quit. That would be what, adults? Adults, adults. And the numbers showed for the two products that are on the market, the Pro and the Power, that there's more cessation of smoking from our menthol ends than from our tobacco ends. And those were the same studies that FDA relied upon to approve our tobacco ends. So they looked at those same studies, which show more efficacy in terms of adult quitting and switching with our menthol ends. That's the 04 and the 05 study? That's correct, Your Honor. But the rejoinder is that those studies only were based on preferences based on survey answers, right? As opposed to use. And FDA says that's not adequate. No, that was a misstatement by them. Those are exactly the kind of randomized control trials of actual use. They did have preferences, but there was actual use. So changed behavior. Yeah, actual change behaviors. You can look at the results on supplemental appendix 445 and supplemental appendix 87. And you'll see the numbers there. For the Logic Pro, you have an 88 percent substantial reduction in quitting for the menthol, and then you have 77 for tobacco. Now, those are both really good numbers, which is why our tobacco product was approved. But our menthol ones are even better than our tobacco. And on the same studies, they're approving our tobacco ones, but they're not approving our menthol ones. That's a mean potato's arbitrary and capricious decision. You submitted, what, 15 applications altogether, right? Mm-hmm. And three of them were menthol? That's right, Your Honor. And those 15, which were approved, which were not approved? Our menthol ones were denied, and our fruit-flavored ones were denied. And we have a pending petition for review that's stated before this court in reconsideration. Our tobacco ones were approved. And how many were the tobacco ones of the 15? I don't have that number. I want to kind of drill down on the policy change argument. Yes, Your Honor. So, as I understand it, the FDA's communications to LOGIC representing that menthol and tobacco would be considered together and distinguished from fruit and candy and so on, those communications were the 2020 enforcement priorities guidance. Yes. Okay? And the June 2020 deficiency notice. Yes. On JA3016. Right, I have it. Couldn't have told us any better. I'm not clear about whether the Office of Science approvals beginning at JA3052 were transmitted to LOGIC, or was that just an internal document that you later got in discovery? You mean the memoranda that were? Yes, 3052 through 303136. This is like the different divisions of the Office of Science saying we don't have a problem with menthol. Yes, that was the back and forth. They said at first there were divisions of the. So you got that. They kept saying it was okay, it was okay. Is there any other documents that led you to believe that menthol and tobacco would be considered together? No, I mean the primary ones we're relying on are the ones that you're. And then you learned that that would not be the case through the OMD? What's it called? The denial. MDO, yes. MDO. So what happened, and we now know, is that getting all, having gotten these approvals from all the different divisions of the Office of Science, the folks that have been working on this for three years, they got everything they ever asked us for. And they said internally we should approve logic. They've done everything right. You know, they've kept us, our products, these menthol products, the two of the three, have been on the market for years. The prevalence is still low. We gave them exactly the studies that they wanted, studies that were good enough for approval of our tobacco products, and they were ready to approve. Then new leadership came on. Another CSLA member, the King member. Yes. But I'm just trying to, and that came through discovery. But were there any other documents that you received during the process that should have led you to think, oh, geez, menthol's not going to be treated like tobacco? Absolutely not, Your Honor. We didn't get any other documents. In fact, if Your Honor saw in the state papers, when we got the MDO and we saw some of the reasoning, because all we had was the market denial order at the time, said this looks like an entirely new approach. And we pointed out some language. We said, we think that there's a secret policy shift here. And then they said in their response, no policy shift. Everything's fine. We just didn't like their evidence. And then stay brief and closed. And then we get these CSLA King memos. It wasn't through discovery. It's an APA action. They were part of the administrative record, and they had to be given to us. Where is there assurance in these documents that for all time menthol was going to be treated with, equated with tobacco? Doesn't it say repeatedly that this is what data shows? This is based on the available data. And it seems to be only saying that this is prioritization. In other words, in terms of the sequencing and the timing, that sweet flavors were going to be addressed first, and then they were going to turn to what remained, which would be like menthol. Mint got sweeped into the flavors. But doesn't the language that's in the 2020 guidance and even in the memos, the deficiency letter indicate that this is really a matter of what is available in terms of current data, and that it's a prioritization issue. They did not phrase it at all as a prioritization issue in the deficiency letter from June 2020. What they said at JA 3016 is menthol and cigarettes are over here for two reasons. One, the cigarettes are actually out there in the world. There's menthol cigarettes, tobacco cigarettes. The tobacco and menthol is over here for the ends. They're over here. And they didn't say it was a matter of prioritization. They said this is the way that you should approach this, and this is the kind of studies we want. So that was a fundamental shift, and that's entirely different from the argument that was rejected by this court in Liquid Labs, where there is a question of parsing what exactly the 2019 memo said. This is just on the face of the deficiency letter, and there's no other way to read that. Where you're pointing to in the deficiency letter, this is 213, paragraph 17. Isn't that in the context of a discussion of the flavored e-cigarettes and the comparison of data between those on the one hand and tobacco and menthol on the other? How do you transpose that to any sorts of comments or assurances about your application for menthol? Well, they are telling us there our approach is going to be putting menthol and tobacco here and putting candy and fruit here. And we have two critiques of that. One is the switcheroo argument, and that's what we're talking about. But the other is that that new policy, their policy change, it's not based on any new science. It's irrational. It doesn't make sense. The data that they rely on do not show at all an equivalence between menthol on one hand and candy fruit on the other. At best, they have it just for mint, but they lump us with all of that. They basically treat us like Puff Bar, like peanut butter milk pie. These are like OG Island Fusion. They lump us with all the other menthols, even though it's undisputed that some menthols have 15 percent regular usage and we have no significant usage, despite being on the market for all this time. And there's no dispute that the candy flavors, the fruit flavors, those numbers on every single metric they show are meaningfully higher than for us. So that's doubly irrational, even if your honor doesn't accept the switcheroo aspect of that argument. There's also that secret policy. Previous secret policy is also independently illegal. It's arbitrary and capricious. So Regents of California says if there is a policy change, the agency has to consider the regulated party's reliance interests. What are Logix's reliance interests at stake here? We developed products and we spent millions and millions of dollars on these studies based upon what FDA told us. That's all we could do. It also made all the sense in the world. This isn't candy flavors. This is one of the two brand types of cigarettes that's out there. 37 percent of cigarettes are menthol. We have no reason to think that this fundamental shift is happening. And if you look at the cases that my friends cite from the other circuits, like the Seventh Circuit decision group, they talk in the same way. They say tobacco and menthol is over here. Everything else is over there. We relied on that very fundamental distinction, which they put in their deficiency letter to us. In black and white, no ambiguity to spend millions of dollars in creating these products and more importantly for their reliance interests here in designing these studies. Can I just go back to paragraph 17? There are four of the premarket tobacco production applications that are numbered there. Are any of those four ones that relate to menthol, per se? These are the fruit ones that we were also submitting. But this is a global one. They're talking to us about all of our various PMTs. I had a question about that, too. 533 is berry mint, 533 is cherry, 538 is cherry. 527 is called menthol purple. Yes. And it's not one of the three menthols that I think we're really talking about, but it does say menthol. What's that about? It's been classified as a fruit rather than a menthol. That's the distinction, and that's how we talk about it throughout. So where is there a reference to the particular premarket tobacco production application for the menthol e-cigarette that places it on one side without suggesting that some comparison with tobacco is needed? This document is referencing all of our PMTAs, and I think the only way to read this document is FDA is placing mint and tobacco together. But most paragraphs of this document are associated with particular applications. So where should we look for the particular instructions that you understood based on the particular application related to menthol? I will bring up that GA side of my rebuttal. Is there any of your brief notes that you believe there was evidence that the FDA dismissed with regard to various aspects of your applications? So, for example, on page 50, you've got MDL, first impermissibly dismissed product-specific evidence that Logix menthol products are helpful to adults, stopping or reducing smoking menthol cigarettes. And then you go on. The problem I have is that the next three sites, the JA 3143, 3176, 3176, and 3177, they all show that the FDA did consider evidence that was submitted in connection with that. So where is something that they ignored or dismissed? Well, that was my response earlier to Judge Porter. They basically overlooked the aspects of LP4 and LP5 that do exactly what they claim to want to do, which is the comparison between the actual efficacy of switching between the menthol-flavored ends and the tobacco-flavored ends. A lot of the discussion we've had today is how did we know we were supposed to do it, what we were supposed to do? The next sentence, the MDO conceded that Logix PMTAs, quote, that evaluated the impact of the new products on switching and cigarette consumption. I could go on. And so if I may, the dispute about what they told us in the deficiency letter is whether we had to show the comparative efficacy. What we're saying there is we actually, even though we were not told we had to show the comparative, we actually did, in fact, show the comparative efficacy in those two studies. They, in their MDO and their attached documents, ignored that aspect of our showing. And this is why we know, we have a strong reason to think this is a de facto ban because they've been telling, and in every one of these cases, we want comparative efficacy. Well, here, because we were doing a lot of different PMTAs at once, it happened to be that comparative efficacy was, in fact, shown because we did a randomized controls trial, and it showed that, for example, for Logix Pro, you got 88 percent cessation of menthol in 77. You mean in adults? In adults at 60 days. So even though we didn't have any reason to think that we needed to do that comparison because of what happened in the deficiency letter, given that we were asking for block authorization for all of these products, the way we ran the trial did, in fact, end up showing that comparative efficacy. They completely ignored and provided no reason to say that that wasn't sufficient. Are we using the right words, both of us? You say ignored. Well, it looks to me like they're not ignoring it. They are considering various aspects on these pages I cited of that evidence. They just didn't give it the weight you wanted or that you believe should have been given to it. Well, with respect, I obviously can't get on their mind. What I actually think happened is they looked at this evidence. They thought that our product should have been granted. They then were given new instructions from their new bosses, and they overlooked the fact that we, in fact, did have this comparative efficacy because we had no reason to highlight the competitive efficacy in our submission because of what they told us in the deficiency letter, but it was there in plain black and white in the submission. And because we hadn't highlighted it, because they hadn't told us that that was something they cared about, they entirely overlooked it, but it was there in black and white. And if they're going to change the standard on us, they're going to say, I'm going to say to anyone, we're going to require comparative efficacy between tobacco and menthol. Then they've got to look at the data we actually produced, which shows the very comparative efficacy that they wanted for the two products that are on the market. Eighty-eight percent is bigger than 77 percent. Why characterize it as a policy change rather than the continued evolution of the development of the agency's policy? It's a work in progress. And at some point, 2021, early 2022, things are looking good for you. And then by the end of 22, the worm turns. Why isn't that just the way policymaking works as opposed to a change? I mean, it's two. One, it is a change. It's taking menthol from one box and putting it in another. And two, the change itself is arbitrary and capricious, because there's no science that changed from the time of the 2020 deficiency letter to 2022. There just absolutely isn't. It was just a policy decision made by a new boss over at FDA. Can I just back up to looking at this maybe from 10,000 feet? The Tobacco Control Act is trying to get users to lessen or stop alcohol or tobacco consumption and trying to get people who haven't yet started not to start. Is that correct? That's correct. And so if you're going to put something out there that purportedly may interest persons in high school or colleges and whatnot, younger folks to start, then what you need to do in the balancing act is get more adults to cease or diminish their use of tobacco products. Is that correct? Yes, that's correct. And so what you're showing is that menthol is not really – younger folks are not that interested in menthol to start, and that adults back off their use of tobacco by virtue of using these particular products as opposed to tobacco. And menthol-flavored cigarettes, which are over 37 percent of the market. The other thing – and I don't want it to get lost in this. But how – show me how that balancing – one balances out the other. So the evidence we have for our products, and even putting aside the fact that their policy itself is illegal, is we have – our other two products are on the market. It's 88 percent cessation or substantial reduction from adult users, and the other one is 77 percent, which is both those numbers are more than the tobacco to the extent that that court considers that relevant. With regard to youth use, we submitted evidence from 2019 that FDA properly characterized as showing low prevalence of use of RNs. It went down in 2022, not up, contrary to what is in the brief. In the 2019 data, RNs were the regular Ns of 0.8 percent of high schoolers. By 2022 – and that's – FDA says that's low prevalence, correct. By 2022, it's a statistically insignificant number, less than 0.8 percent. So it's going down from 19, where they say it's low prevalence, to 22. And that's from our products being on the market. These products are on the market the whole time, and they're less popular from youth. The FDA talks about, you know, we don't know if their strategies are effective. The proof is in the pudding. How much more effective could it be? Is the evidence – I thought the evidence was for younger folks that they were increasingly using vaping products in the last few years as opposed to decreasing – is that incorrect? It went up and then went down substantially. But with regard to our products, it went down the whole time. Youth were not using our products. We were at 0.8 percent in 2019 for regular use by high schoolers. By the time we get to 2022, there's no statistically significant evidence of any youth using RNs. I mean, there's no – Where do we find that in the record? That is – the 2019 data is at a JA982, and the 2022 data is a JA1156 through 1160. Other questions? One of the issues that you seem to be disputing with the FDA is whether they can take account of – they can make the sort of predictive judgment that because of flavors coming off the market, that they can anticipate a move toward menthol among youth, and that this is sort of preemptive in doing that. You argue that's speculative, but even the language of the statute, it mandates that they consider risk, which seems like it embodies the notion of predictive judgments. Why is that wrong? Because in order to determine whether it's speculative or arbitrary, you have to see what they're relying on. The only thing they rely on for that judgment is that folks changed from closed end to open end, just two different kinds of e-cigarette types. And what FDA says in that particular document is that it shows the stickiness of flavors. So that actually – the one evidence they rely on to support what we say is speculation actually refutes them. It refutes the notion that if they take candy and fruit off the market for these other brands, that folks will migrate to our menthol. But the evidence that they cite doesn't support that at all. It just supports switching on the type of e-cigarette to keep the same flavor. Okay. We will hear from the government. And we had about an additional 12 or so minutes. We'll – they'll also be on our time. Good afternoon, Your Honors, and may it please the Court. Catherine Potty for the United States. FDA denied the applications here after finding that petitioners' menthol-flavored e-cigarettes present a risk to kids that is not outweighed by the evidence of benefits to adult smokers. Starting with the risk side, we know that over 2.5 million middle and high school students use e-cigarettes and are thus getting addicted to nicotine at alarmingly high rates. One of the concerns here is whether there is a categorical ban on menthol products put out by Logic. Now, you say in your brief there is no categorical ban, but what could a seller of menthol-flavored ends submit to get their application approved? There is absolutely no categorical ban. The record does show that FDA did consider all of Logic's product-specific evidence here. Has a menthol ends product ever been approved? No, Your Honor. But the FDA's – Logic's applications were the first menthol applications that FDA has acted on. And FDA has explained that there are ways in which a manufacturer might be able to reduce the risk to kids. It described some restrictions beyond the traditional advertising and promotion and sales restrictions to include device access restrictions. I think some manufacturers are experimenting with, you know, a fingerprinting option or options that would prevent the use of these devices in and around schools because of their location. So there are options that manufacturers are looking into to reduce the risk to kids. Do you know how many – just roughly – how many menthol applications have been submitted? I don't know that number, Your Honor. Like 100,000? I would imagine that it's – so the number of applications, you know, the applications are bundled. I think the number for individual products might be quite high. But in terms of, you know, the set of applications for each manufacturer, I think probably in the tens. Why didn't you send Logic another deficiency letter asking for evidence comparing the benefits of menthol-flavored ends over tobacco-flavored ends like you did for the fruit-flavored products? I don't know why another letter was not sent. But there's no requirement that FDA issue any sort of letter in these circumstances. And moreover, Logic knew that it had to submit this comparative evidence. That's why, you know, it's claiming that its studies do purport to compare the menthol flavors with the tobacco flavors. It's just that the evidence is not actually borne out in the studies. And where can you – where can you point us to where that was communicated to them as a requirement? Excuse me, the that – as in the comparison? That it would be nice to have a comparison of menthol versus tobacco-flavored ends products. So in the Tobacco Control Act itself, this court has already determined that that statute requires a comparative analysis. So if there's one product that is significantly riskier to kids but does not have a countervailing benefit, then that just flows directly from the Tobacco Control Act. And so FDA is required to deny any application that – for which there is no net benefit. And so the presence of tobacco-flavored e-cigarettes in the market and the markedly higher use of menthol-flavored e-cigarettes over tobacco-flavored ones itself gave – But when you'd been telling them through the guidance, the 2020 guidance and the deficiency notice, that menthol and tobacco would be grouped together as distinguished from fruits and candies and so on, how would they have known that they were supposed to compare specifically menthol against tobacco? That guidance and letter reflected the evidence that was available to FDA at the time. FDA's understanding at the time was that menthol use was much lower and comparable to tobacco use. I think there was a 2019 Leventhal study indicating that that use was between 1.5 and 7 percent and was much higher by the time FDA decided these applications here. And this court did already consider the argument that petitioners were not aware of the need to compare their flavored e-cigarettes with tobacco-flavored ones and has already rejected it. As the court explained, the statute itself necessarily requires a comparative analysis, and when the risk increases, so does the burden of demonstrating a benefit. Moreover, Logic has not indicated at all that it has evidence showing this comparative benefit that was not already submitted and considered by the agency. What is your answer to the studies that your colleagues cited on supplemental appendix 445 and 87, like Logic Pro and 88 and 77 percents? I don't believe I can discuss the details of the studies in open court, Your Honor, but I can point you to the general conclusions of these very studies, that there were no consistent and clear trends as between the flavors or attributable to the different flavors. I would direct the court to pages 355 to 57 of the supplemental appendix, as well as pages around 606. And if the court would like to close the courtroom, I would be very happy to discuss the details, but in general, the difference in the results and the standard deviations does not demonstrate at all that the difference is statistically significant. Thank you. Logic claims that FDA dismissed its evidence and adopted a categorical approach, but the evidence here really puts that concern to rest. FDA did consider every aspect of the evidence. Logic has identified no evidence that FDA failed to consider, no aspect of the problem that FDA failed to consider, and it was absolutely not arbitrary and capricious for FDA to deny these applications when there is strong evidence of youth use of e-cigarettes and not at all conclusive evidence that there's any additional benefit to justify that risk. Part of their concern seems to be that there was not sufficient attention paid to their product-specific evidence as opposed to the more generally available literature. You're certainly authorized to take account of that literature, but where do you draw the line? If there are product-specific studies that point one way, can you ignore those and just follow what is out there with the general literature? So FDA is required to consider all of the relevant information before it, and the court did say that FDA's consideration of the risks of flavored e-cigarettes is a category, which was based on these same types of data, was an appropriate basis upon which to require this additional evidence of adult benefit. If there were particular evidence that showed that this general risk of menthol-flavored e-cigarettes did not apply to the specific products at issue here, FDA would absolutely consider that. The problem is that when FDA did consider that evidence, it found it to not at all show what petitioners are claiming here. As we pointed out, the 2022 study indicates that over 4% of youth use logic e-cigarettes. And so there is just not product-specific evidence to look to here that the general research would not be relevant to the applications for e-cigarettes. I don't know how to frame that 4% number, how to think about it, because I think the logic products are like 10th, right, 10th most popular. There's Puff Bar and Juul and so on, and those percentages are like 60%, 70%. So when I hear you say the logic number is 4%, to me that sounds like sort of it works in their favor. Why isn't that the case? Well, 4% is not a trivial number of kids. I mean, 1 in 7 high schoolers use e-cigarettes, and 1 in 20, about 4 or 5%, that's really not a small amount in terms of market share. How many of those users are using logic products? Between 4% to 5% said that they use logic products. 4.3, I think, is the number in the 2022 study. Do you know how many people that translates to? I don't have the numbers exactly, but I think 2.5 million, about 4.3% of that, I think, said they use logic e-cigarettes. It's not like 80,000, is that about right? I don't, I think so, a fifth, probably close to 80,000, 90,000. This court did address the argument about the markets and the fluidity of the market in liquid labs and described the consistent role of flavor in driving youth attraction and appeal. So this rate of logic youth use is helpful in demonstrating that logic menthol-flavored e-cigarettes are not different or special from the other menthol e-cigarettes because there is a significant amount of youth use. But the market is quite fluid, and FDA has explained that it really is, there is a consistent role of the menthol flavor here in driving the youth appeal. I want to come back to something I asked about before. When I look at the TPL review here, which gives you, I guess, some more detail, the main problem in the FDA's view is that logic provided no data on smokers' actual use of the products here in comparison to those products that would be tobacco-flavored. If that's the case, I don't understand if one deficiency notice went out on fruit-flavored products, why another deficiency notice didn't go out? And your response was, we don't have to do that. I get that, but why didn't you do that if it's still going to be the main item on which you rely? I don't know the answer to that, Your Honor. I do know that logic does say that there are studies, they submitted studies that do show this. FDA considered that and determined that the reduction in cigarettes per day across the cohorts was quite similar, that there was not an increased benefit of menthol-flavored e-cigarettes, and logic has not hinted that they would have provided, that they have other information to provide, but if they do, they can resubmit an application to FDA. The structure of the statute itself requires FDA to deny an application and for none of these products to be on the market until FDA affirmatively approves the grants of the marketing application. So your friends characterized what happened in the summer of 2022 as a policy change. I gather you don't agree with that characterization. How would you describe it? No, Your Honor. FDA was considering the problem of e-cigarettes according to the data available at the time and was doing what it could to enforce the Tobacco Control Act's mandate according to what kinds of products were the most popular with kids at the time. At the point of the deficiency letter, the flavored e-cigarettes were much more popular and that is what FDA addressed and was interested in addressing first. Okay, but I'm looking at the Office of Science document that begins at 3052. At 3097, this is in the social science, you know, there's like chemistry and epidemiology. In the social science section on 3097, there's a sentence that says LP04 and 05, those two studies, do not provide adequate evidence that marketing the non-tobacco and non-menthol flavored products will promote adult smokers switching to ENDS more than marketing the tobacco and menthol flavored new products which have lower youth appeal. And then, you know, it goes on to say that PMTAs do not raise concerns about issuing the marketing orders for the menthol products, okay, to make it short. That was as late as March 2022. So if that was the scientist's conclusion in March 2022 based on the then available science, what happened in July? So I do believe that the 2022 National Youth Tobacco Survey included data that was still being gathered at the time around March and was published somewhat later in 2022. However, as the memos describe, there were ongoing discussions between the Office of the Center Director and the Office of Science about these products from 2021 through 2022. And even before there was a change in leadership in 2022, the Office of the Center Director did have some concerns about the preliminary recommendations and some of the policy judgments that were incorporated into those recommendations in the Office of Science's preliminary review. So there was no final decision. There was no policy, excuse me, scientific determination that had at all been finalized. There were these ongoing discussions, and that did continue through 2022. And FDA's views on this have evolved according to the evolving data, as we've explained, but also the Office of Science itself reassessed the information and determined that the approach, which is just to require a benefit to be shown above tobacco-flavored e-cigarettes because of the increased risk, was a reasonable approach. I have a question about just sort of what happens practically. Let's say we affirm the MDO first. Talk about that. Then can Logic file another PMTA with the sort of robust and reliable evidence that you're looking for? Yes, Your Honor. And let's say that we vacate the MDO. Then what happens next? What's the FDA do next? I believe that the FDA would reconsider the application and perhaps solicit additional information. I think it would depend on the reasoning provided in this court's opinion as to how FDA responds. It seems like it might be sort of tantamount to another deficiency notice. You come go back, ask for more, they provide more, you just keep going. I do think it would very strongly depend on the reasoning provided in the court's order, but FDA would respond to that reasoning in an appropriate manner. Logic here truly has not identified any evidence that FDA failed to consider. It does disagree with FDA's scientific judgments concerning the evidence, but Congress put the task of determining whether a product was appropriate for the protection of the public health in the hands of FDA and not in the hands of the tobacco companies. So although Logic does view the evidence differently, that is not a basis for finding that FDA's judgment here was arbitrary and capricious. I know there's a dispute about whether there was a policy change, but if there was a policy change, I think the Supreme Court has told us in a number of cases, you know, the State Farm line of cases, that if the agency changes a policy, it needs to give a reasoned explanation that considers, among other things, the regulated party's reliance interests and reasonable alternatives that would have been available other than just an outright denial. So maybe because the FDA doesn't think it changed policy, that's the answer, but I don't see in the TPL or the MDO, for example, any discussion of reliance interests or reasonable alternatives. Is that, you know, am I incorrect about that? Well, there was no policy change, Your Honor, and FDA did consider all of the specific application evidence here, including the evidence that petitioners say show this comparative efficacy between their menthol and tobacco-flavored e-cigarettes. So even they themselves indicate that they were not prejudiced by any notice concerning their other applications for flavored e-cigarettes or for non-menthol-flavored e-cigarettes. And so even if there were some sort of policy change between what they were aware of and between the time now, there was just no prejudice. Furthermore, again, as we've explained, the available data did change over time between the 2020 guidance and FDA's decision in 2022, and FDA is responsible for denying any application that, according to all of the evidence before FDA, does not show that the net benefits outweigh the costs. I understand part of the FDA's, at least as described in your briefing, part of the FDA's thinking was that you could predict that there would be a shift, migration of youth as the market itself changed. Where is there authority for the FDA to base a decision on just speculation that there is going to be this change? Two points, Your Honor. I'm very happy to discuss this question. I do not think there's evidence about youth use now, so it is not pure speculation. But second, the structure of the Tobacco Control Act requires FDA to evaluate these products in general before they even go on the market. So the nature of the Tobacco Control Act requires this sort of looking-forward judgment, and it is inherent in the concept of risk that there is some weighing of probabilities about what may happen. And this Court has recognized the fluidity of the market and the associated risks in liquid labs. Those predictions have to be based on facts, right, as some factual basis to give rise to that even predictive judgment. What do you look to in this record as the basis for making that judgment about the changing marketplace for youth? So in 2022, we had evidence that over a quarter of middle and high school e-cigarette users used menthol-flavored e-cigarettes. This rate is much higher than that of tobacco-flavored e-cigarettes and is comparable to the rates for mint and candy. And I do want to emphasize that the candy, desserts, sweets category is all lumped together. So that includes kids who use the butterscotch flavor or kids who use the cheesecake flavor or the cinnamon candy flavor. So even though those numbers are somewhat higher than the numbers for menthol specifically, the category is much broader. And furthermore, the rates really are comparable and that judgment is FDA. So I think there is abundant evidence that FDA did specifically consider whether factors unique to menthol, including perhaps the difference in youth flavors, including the youth preferences, and including the availability of menthol combustible cigarettes on the market. And based on the specific consideration, determined that the risks were nonetheless similar to kids and that manufacturers would need to show enough benefit to offset that increased risk over tobacco-flavored e-cigarettes. If there are no further questions, we ask this court to define a petition. Thank you. Mr. Taylor. Thank you, Your Honors. I know I'm way over time and I appreciate your indulgence in letting me do this rebuttal. First, the court asked me for the deficiency letter on JA3020. It lists all of the applications to which the deficiency letter applies. 528 is logic vape-leaf menthol, 534 is logic pro menthol, and 539 is logic power menthol. So the deficiency letter applied to all. With regard to predictive judgments, Your Honor, the predictive judgment that FDA claimed to make was complete speculation. What we do know is after the 2020 change in enforcement priorities, the cartridge-based sweets and candies were pulled off the market. What happened to our appeal to youth? It went down. It was even lower in 2022 than it was in 2019. That's the cold, hard data. They have absolutely, absolutely no evidence whatsoever in this record to suggest that if candy flavors get off the market, that Logix ends use by youth isn't going to go up at all. Third, the entire... Is that argument as to Logix menthol e-cigarette alone, or are you saying that that's true as to menthol e-cigarettes across the board? This is our products. Obviously, there are other companies that have had different results because they market to youth. They are irresponsible companies, and we think that FDA should be prioritizing its enforcement against them. For example, Puff Bar, which continues to sell products all over the market, 15% regular use, not taking enforcement action on them, where they're going after us. They said we had low prevalence in 2019. In 2022, we're lower, and they're going after us. They're leaving Puff Bar alone, which is 15%. Are you referring to Logix menthol products or all Logix products? It's all Logix products, obviously. We have a cartridge, and you can put menthol in there or tobacco-flavored in there. Is there a record site, or did you already give it to us for that? Yeah, that was the record site I gave you, Your Honor, where it lists all the different products of regular use. Those don't differentiate between... I mean going down from 2019. Yes, those are the numbers I gave you right at the end of my presentation. For 2022, for high school students, I think your opposing counsel said that roughly one out of four prefers a menthol product. Is that correct? It's not one out of four, Your Honor. The way those numbers are done is if someone uses both menthol and candy, you still count that against menthol. So the 26.6% that they use on menthol are not exclusively menthol users. Those could also be using both menthol and candy. And the 2022 data does not show at all how many there are tobacco. And there's nothing in the record that wouldn't suggest that the tobacco number would be just as high as the menthol number. Was it the 2022 survey is what we're dealing with here, is that correct? That's correct, Your Honor. And of the 2022 survey, what percentage of high school students prefer a menthol e-cigarette? The only data we have from there is that 26.6% of ENDS users use menthol, with 69% for fruit, 38% for candy. There is no information in that survey of how many use tobacco and other ENDS. So for all we know from the record, that number could be just as high as 26, which is the third point I was actually going to make. In order for the comparative efficacy requirement to even logically make sense, they have to show that menthol flavors are more appealing to youth than tobacco flavors. There is zero evidence in this record, zero, absolutely none, that that is true. Why do they have to show that? Isn't it simply a concern that youth is using menthol or any product that might pull them into becoming long-term smokers? Well, the comparative efficacy, for example, the two studies we have, LP4 and LP5, what they show and they now claim is statistically insignificant, which is not a point they made in the MDO, which is not allowed under Chenery, but in any event, the 88% and the 77% for Logic Pro. The only reason that comparison would even be relevant is if you're assuming it's better that the tobacco flavors are out there rather than the menthol flavor. I thought that point was the benefit to adults. Right, but what they say and why they, for example, they gave us authorization for our tobacco ENDS on a lower number than for our menthol ENDS. The only way that makes sense is if on the harm side, menthol ENDS are worse, more appealing to youth than tobacco ENDS. They have absolutely, absolutely no evidence in this record to suggest that. In that NYTS study, what does, is the concept of use defined? Like if someone is normally a candy user, but they say to their friend, let me try that menthol for a minute. I don't like it. I'm going to go back to candy. Is that considered use or is it like regular, you know? So there's two, there's two decimals. One is what they ask you about brands. They say, what brand do you use? And so they say, which are your regular brands versus which are, you've just tried. So the 4% number that they're quoting, that's just folks that have tried Logic of among users is 0.4% of all of the whole population. When you're talking about regular use, which is the actual concern, there's no significantly significant number of youth using any of our ENDS products. Where we are, we had 0.8% in 2019. And we would look at NYTS for that? Yes, that's right. Those are the two numbers that I gave, two J numbers I gave at the end of my presentation on opening. I want to follow up on the question that Judge Porter had asked you about what as a practical matter. What's the difference in the dispositions that we might consider here? Because it sounds like in either case, the consequence or likely consequence would be, you would put in or have the opportunity to put in additional studies and make the showing required for menthol. That, Your Honor, is only assuming that, Your Honor, is by the premise, absolutely nothing in the record, that menthol ENDS are worse for youth. No, the point is, if you vacate and remand, you go back and you get a chance to restate your case and make sure that a study is done, for example, between menthol and tobacco. But if you have this petition denied, your opposing counsel says you still can come back and put in new evidence. So, practically speaking, what's the difference? So, first of all, we already submitted LP4 and LP5 on both our menthol and our tobacco. Our tobacco was approved under the same reasoning for consistency. Our menthol needs to be approved for the same reason the tobacco was approved. The numbers, this is a significant point. In simple terms, what would you do differently, depending on what we did? Let's say we denied the petition versus we vacated and remanded. What would be different in terms of the substantive evidence that you would put before the FDA? I mean, it depends on what your honors say. I mean, if your honors say that in order for FDA to require this comparative efficacy, there has to be a sufficient basis in the record that menthol ENDS are actually worse than tobacco ENDS, then there would actually have to be some data for that. If for some reason your honors say, based on no record evidence, that yes, tobacco ENDS are better than menthol ENDS, and so we need to do a comparative study, we would, for the first time for FDA, highlight the fact that we have this evidence in the record. What counsel said today was statistically significant. I mean, maybe that was an argument prepared for oral argument and discussing with some FDA bureaucrats or something, but that certainly wasn't in the MDO or in supporting documents. We would hope that FDA would, I think for the first time, actually look at our evidence on this comparative point, and I think we would get a grant. But even if that were not the case and we needed to submit new evidence, then of course our products would remain on the market until that process completed, which is no problem at all for youth, since youth are just not using our products. That would be the real world difference, is our products would stay on the market during the time where this was happening. And your products are used primarily, what, by adults? The biggest cohort that uses our products are those over 61. If you take it away, those folks are just going to have great incentive to turn back to menthol cigarettes, which is the whole reason e-cigarettes were developed, is that e-cigarettes, even though they are full of specialist use, are significantly better than cigarettes, including menthol cigarettes. And if you take the stuff off the market, the people who are going to suffer are going to be those adult menthol smokers, and no youth are going to benefit because there are no youth in the 2022 survey, which is their lodestar, that use our products as their regular end product. You've said a couple times, I'm not going to get it right, so you tell me, but something like they have to show that menthol is better than tobacco, or what is it? In order for them to require the comparative efficacy survey, the only way that even makes sense is if tobacco ends are actually better for youth than menthol ends. If that evidence isn't there, then the comparative efficacy inquiry makes no sense. You just look at each product on its own merits. But why is it their burden to prove anything? Why isn't it your burden? It's only their burden if they want to make this new comparative efficacy standard. What we're saying is you should evaluate our products on menthol ends the same way as you would evaluate our products on tobacco ends. It was the exact same studies. You give them the same treatment, and you get the same result, which is, by the way, what the Office of Science was going to do until the leadership forced them to change their policy. Okay. We would appreciate the parties sharing the cost for a transcript of argument today. And we thank you for excellent briefing and argument. We'll take the case under advisement. Thank you.